**In re L.P. MAUN, M.D., LTD., Debtor.**

**L.P. MAUN, M.D., LTD., and Central Bank–Granite City, Plaintiffs,**

**v.**

**Amorn SALYAPONGSE, Defendant.**

**Bankruptcy No. BK 86–31038.
Adv. No. 87–0245.**

United States Bankruptcy Court,
S.D. Illinois.

Nov. 9, 1988.

Thomas LeChien, Belleville, Ill., for debtor/plaintiff.

Brian Konzen, Granite City, Ill., for Central Bank.

Steven Stanton, Belleville, Ill., for defendant Salyapongse.

## MEMORANDUM AND ORDER

KENNETH J. MEYERS, Bankruptcy Judge.

This matter is before the Court on a Second Amended Complaint to Collect Rev-

enues filed by debtor L.P. Maun, M.D., Ltd., formerly known as Maun–Salyapongse, Ltd. ("debtor"), against Dr. Amorn Salyapongse ("Salyapongse"). Debtor alleges that Salyapongse retained and converted proceeds of debtor's accounts receivable. At the time of the hearing on the complaint, Salyapongse filed a motion to dismiss for lack of subject matter jurisdiction and a motion for summary judgment. Both motions were taken under advisement along with the case.

The facts underlying this matter are not in dispute.[1] Debtor is a professional corporation. Dr. Lorenzo P. Maun ("Maun") is debtor's president and majority stockholder. Salyapongse worked for debtor from 1972 until November 1985, during which time he had an employment contract with debtor. Salyapongse also purchased some of debtor's stock. During his employment by debtor, Salyapongse had the right to sign checks on debtor's behalf. However, he did not endorse or deposit checks received by debtor for payment on accounts receivable.

Salyapongse terminated his employment with debtor on November 11, 1985, the same day he met with Maun to set out the conditions under which his termination would proceed. After the meeting, certain matters agreed upon by Salyapongse and Maun were summarized in a letter written by Gary L. Krauss, debtor's accountant, which was then sent to both parties. The agreement provided, *inter alia,* that all revenue received for services performed by either doctor through November 11, 1985 would remain the property of debtor and that revenue received by Salyapongse for services he performed after that date would be retained by him. For services rendered after November 11, 1985, debtor would retain only the revenue generated by Maun. The agreement also provided that Salyapongse was to receive his pay for the month of October 1985 "as soon as possible." The agreement did not authorize Salyapongse to cash or endorse any checks on debtor's behalf after November 11, 1985.

After leaving debtor's employ, Salyapongse opened his own office, at which time either he or his staff submitted a change of address form to the Post Office. As a result, some mail addressed to debtor, including payments on debtor's accounts receivable, was erroneously delivered to Salyapongse. At first, Salyapongse forwarded the checks he received to debtor. However, after a month had passed and he still had not received his October 1985 pay, he began keeping the checks that were delivered to him. Beginning on December 14, 1985, all checks Salyapongse received were endorsed with his corporation's stamp and deposited into his corporate account. These deposits included payments which were rightfully Salyapongse's as well as those which, according to the parties' agreement, should have gone to debtor. Salyapongse's staff maintained a list showing which payments were to have gone to debtor under the agreement.

Salyapongse notified Maun that he was keeping the checks but he did not tell Maun that he was planning to hold the checks until he was paid what he felt Maun owed him. At issue was Salyapongse's back pay, a dispute over pension plan funds, payment for Salyapongse's stock in debtor, and payment of his attorney fees.

Salyapongse eventually collected $74,493.17 in payments which had been destined for debtor's accounts receivable. Most of the funds were received before debtor filed its bankruptcy petition on October 7, 1986, but, according to Salyapongse's own records, $2,700.00 was received after the petition was filed and $5,705.00 was received within ninety days before the petition was filed.

Debtor filed the present adversary complaint on November 4, 1987. A demand for payment was made by debtor on June 9, 1988. Around the same time, Central Bank–Granite City ("Central Bank"), which claims a security interest in debtor's accounts receivable including the money now

---

**1.** At the hearing, the parties agreed that live testimonial evidence was not necessary and that Salyapongse's deposition of May 31, 1988 (plaintiff's exhibit # 19) established the facts underlying this matter.

held by Salyapongse, moved for leave to join as a party. That motion was granted on June 20, 1988 and, on July 11, 1988, Central Bank filed its own complaint to collect revenues against Salyapongse.[2]

At the hearing, the Court denied for the time being Salyapongse's motion to dismiss Central Bank's complaint for lack of subject matter jurisdiction. The Court also decided to hold Central Bank's complaint in abeyance pending the resolution of debtor's turnover action against Salyapongse.[3]

### *Subject Matter Jurisdiction*

In his motion to dismiss, Salyapongse argues that this Court lacks subject matter jurisdiction over this case. Specifically, he claims that debtor has taken the position that the proceeds of the accounts receivable (which are currently being held by Salyapongse) are subject to the valid lien of Central Bank. As a result, Salyapongse argues, if debtor prevails in this proceeding it would be obliged to deliver the recovered funds to Central Bank and the funds would not benefit the bankruptcy estate.

In support of his motion, Salyapongse relies on a copy of debtor's loan record at Central Bank showing the outstanding balance on debtor's loan to be zero. Debtor's accounts receivable were also pledged as security for a $350,000.00 loan made by Central Bank to Dr. Maun personally which currently has an outstanding balance of approximately $150,000.00. Salyapongse claims that the funds sought by debtor are Central Bank's cash collateral which secured Maun's personal loan and that debtor no longer has any stake in those funds. He argues that the Court has no jurisdiction over this matter since Central Bank's lien on the funds means that they are no longer part of the bankruptcy estate.

In response to the motion to dismiss, debtor argues that the Court has jurisdiction because the complaint requests a turnover of its property, *i.e.*, the funds now held by Salyapongse. A turnover action is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(E). Debtor also argues that the note to Central Bank for Maun's loan, on which its accounts receivable were pledged, requires a payment of approximately $5,000.00 per month and that application of the funds in question towards payment of that note will greatly reduce the debt owed to Central Bank and will thereby benefit the estate.

The provisions of 28 U.S.C. § 157(b) state in pertinent part:

(b)(1) Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title.

(2) Core proceedings include but are not limited to—

(E) orders to turn over property of the estate.

There is a split of authority as to whether turnover actions by bankruptcy trustees or debtors-in-possession to collect accounts receivable are core proceedings. See, *e.g., In re Nell*, 71 B.R. 305 (D.Utah 1987), and cases cited therein. However, in the present case, the issue is not collection of accounts receivable; the accounts receivable have already been collected and the funds are being held by Salyapongse. Rather, the issue is whether these funds are property of the estate which the debtor-in-possession (the debtor herein) can retrieve by way of a turnover action pursuant to 11 U.S.C. § 542.[4]

---

**2.** In light of the Court's decision today in favor of debtor, it appears that Central Bank's action against Salyapongse is now moot.

**3.** After the hearing, debtor was given leave to amend its complaint to reflect the fact that it is asking for turnover of the disputed funds pursuant to 28 U.S.C. § 157(b)(2)(E). Salyapongse has not objected to the amending of the com-

plaint *per se* but he has renewed his motion to dismiss for lack of subject matter jurisdiction.

**4.** 11 U.S.C. § 542 provides in pertinent part: (a) ... an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the trustee may exempt under section 522 of this title, shall deliver to the trustee, and ac-

In an action brought under 11 U.S.C. § 542, one of the fundamental determinations which must be made is whether the debtor has an interest in the property sought. When the debtor does not have an interest in the property sought the property does not become part of the estate and cannot be made subject to an order of turnover. *In re National Equipment & Mold Corp.*, 64 B.R. 239, 244–45 (Bankr.N.D.Ohio 1986). If there is a contract between a debtor and a secured creditor regarding use of accounts receivable as security, the terms of that contract determine whether the debtor retains any interest in the receivables which pass to the estate upon the filing of a bankruptcy petition. *Id.* at 245.

In the *National Equipment & Mold* case, the debtor had given a bank a security interest in its accounts receivable. The court reviewed the security agreement and found that the debtor had intended to convey ownership of the accounts receivable to the bank. From this the court concluded that the estate had no interest in the receivables which had been collected directly by the bank and that, therefore, the trustee was not entitled to maintain a turnover action against the bank. *Id.* at 245–46.

■ In the present case, Illinois law gave debtor the right to pledge its accounts receivable as collateral for Central Bank's $350,000.00 loan to Maun personally. See, *In re Provident Hospital & Training Association*, 79 B.R. 374 (Bankr.N.D.Ill.1987); *In re Altek Systems, Inc.*, 14 B.R. 144 (Bankr.N.D.Ill.1981). The security agreement for that loan (defendant's exhibit # 1) provided that debtor was to collect the accounts receivable and to deposit the funds received in a special collection account at the bank. The agreement also provided that, absent default, debtor could withdraw whatever funds it wanted from the account. Additionally, there was no evidence that Central Bank ever asserted any control over the accounts receivable even after Maun went into default on the loan. Based on these facts it is clear that debtor maintained an interest in the accounts receivable it pledged to Central Bank as security for Maun's loan.

■ Debtor's recovery of this money potentially has a major impact on the bankruptcy estate. Under the agreed cash collateral order entered on June 18, 1987, debtor must pay Central Bank $5,900.00 plus interest on this loan each month. If the funds held by Salyapongse were applied by debtor against the debt owed to Central Bank it would reduce that debt considerably thereby assisting in debtor's reorganization effort. Conversely, if Salyapongse prevails in his efforts to retain the funds, it will significantly reduce the monies available for reorganization.

Salyapongse cites *In re Friendship Medical Center*, 710 F.2d 1297 (7th Cir. 1983) to support his position that this Court lacks jurisdiction. In *Friendship Medical Center*, the Seventh Circuit held that "[u]nless it is impossible to administer completely the bankrupt's estate, a bankruptcy court lacks jurisdiction of a controversy between parties over a matter in which the trustee asserts no interest." *Id.* at 1302. Another case cited by Salyapongse held that bankruptcy courts lack jurisdiction to decide a dispute over money in which the estate has made no claim to the funds unless the dispute "impacts upon the estate in some other way." *In re Jodan's Pro Hardware*, 49 B.R. 976, 977 (Bankr.E.D.Wisc.1985).

Both of the cases cited by Salyapongse involve situations where the estate had made no claims against the property in dispute and the resolution of those disputes would not have had any impact on the estate. In contrast to the cited cases, the debtor-in-possession in the present case has claimed the property at issue and, as noted earlier, the recovery of that property would have an impact on the estate.

Accordingly, the Court finds that this action is for turnover of property of the estate under 11 U.S.C. § 542(a), which is

count for, such property or the value of such property, unless such property is of inconse-

quential value or benefit to the estate.

within this Court's jurisdiction as a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(E). Therefore, Salyapongse's motion to dismiss will be denied.

### Setoff and Turnover

The November 11, 1985 meeting between Salyapongse and Maun, as summarized in Gary Krauss' letter of November 18, 1985, produced the following agreement as to the division of revenues received for services rendered by the two doctors:

9) Patient revenues are to be separated as follows:

A) For services performed through November 11, 1985 all revenue to Maun/Salyapongse Ltd.

B) For services performed November 12, 1985 and later Dr. Maun's revenue goes to the corporation, Dr. Salyapongse [sic] to himself.

(plaintiff's exhibit # 1). Debtor claims that, as a result of this agreement, it had an absolute and unconditional right to immediate possession of the checks constituting payments on its accounts receivable which were retained by Salyapongse. Debtor further claims that by retaining, endorsing and depositing the checks, without authorization, Salyapongse committed a tortious conversion of what were rightfully debtor's funds.

In response, Salyapongse claims the affirmative defense of setoff. He argues that he has valid, allowed claims against debtor which exceed the amount of the funds he holds and that his claims against the bankruptcy estate and the debt he alleges he owes the estate (*i.e.*, the funds he holds) are mutual, prepetition debts which are subject to setoff pursuant to 11 U.S.C. § 553(a). He further argues that turnover of property is not permitted to the extent that the property may be subject to a valid right of setoff. Finally, he claims that his retention of the accounts receivable funds does not constitute conversion under Illinois law since debtor's right to the funds was not absolute but rather was conditioned upon its payments to Salyapongse under the agreement.

Although the parties have concentrated most of their efforts on the question of whether Salyapongse converted the accounts receivable proceeds, the Court does not need to reach the conversion issue in order to decide this case. The main question to be answered is whether the funds held by Salyapongse are a debt owed to debtor by Salyapongse which may be subject to setoff or are property of debtor's estate which may be subject to a turnover order.

The right to setoff in bankruptcy is provided for at 11 U.S.C. § 553(a), which states in pertinent part:

Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case ...

A creditor establishes a right of setoff under this section of the Bankruptcy Code when the following three-part test is met:

1. A debt owed by the creditor to the debtor which arose prior to the commencement of the bankruptcy case;
2. A claim of the creditor against the debtor which arose prior to the commencement of the bankruptcy case; and
3. The debt and the claim are mutual obligations.

*In re Reinhart*, 76 B.R. 746, 749 (Bankr.D. S.D.1987); *In re Brooks Farms*, 70 B.R. 368, 371 (Bankr.E.D.Wis.1987).

In the present case the parties appear to have assumed that both Salyapongse's claim against the estate and the debt he is alleged to owe the estate arose prepetition. Although some of the funds held by Salyapongse may not qualify as prepetition debt subject to setoff because they were received by him either within 90 days before the filing of the bankruptcy petition or after the petition was filed,[5]

---

**5.** $2,700.00 of the funds kept by Salyapongse was received by him after the petition was filed

most of the funds would satisfy the prepetition debt requirement for setoff noted previously. This leaves only the question of whether the debt and the claim are mutual obligations.

■ "Mutuality of the debt and claim means that the creditor is indebted to the debtor who likewise owes a debt to the creditor." *In re Taylor Motors,* 60 B.R. 760, 763 (Bankr.D.Nev.1986). Additionally, for a debt and a claim to be "mutual" they must be in the same right and between the same parties standing in the same capacity. 4 *Collier on Bankruptcy,* ¶ 553.04[2] at 553–18 (15th ed. 1988); *In re Windsor Communications Group, Inc.,* 79 B.R. 210, 217 (E.D.Pa.1987); *In re Rinehart, supra,* 76 B.R. at 750. There is no mutuality, and therefore no right to setoff, where the creditor does not "owe" the debtor. See, *In re Maytag Sales and Service, Inc.,* 23 B.R. 384, 390 (N.D.Ga.1982); *In re Brendern Enterprises, Inc.,* 12 B.R. 458, 460 (Bankr.E.D.Pa.1981).

In the present case, Salyapongse does not "owe" debtor anything which could be used for setoff. Instead, the funds held by Salyapongse are proceeds of debtor's accounts receivable which are property of the bankruptcy estate.

The November 11, 1985 agreement, as memorialized in Gary Krauss' letter of November 18, 1985, provided for the disposition of debtor's accounts receivable. Salyapongse testified that Krauss' letter summarized the agreement and he has not attempted to challenge the letter's accuracy or validity. The letter shows that the parties had a clear and unambiguous agreement that debtor was to receive the proceeds of the accounts receivable for services performed by both Salyapongse and Maun through November 11, 1985. The agreement merely continued the practice that was in effect until Salyapongse terminated his employment that all patient revenues were turned over to the corporation instead of being kept by the physician who performed the service.

Initially, Salyapongse forwarded all the checks he received to the debtor because he obviously believed that the funds were rightfully debtor's. Nevertheless, he now argues that debtor's right to the funds was conditioned on his receiving his pay for the months of October 1985 "as soon as possible."

The parties did agree that he was to receive his October 1985 pay as soon as possible but there is no indication from either the language of Krauss' letter or the evidence presented to the Court that debtor's right to the accounts receivable proceeds was conditioned on its sending Salyapongse his October 1985 pay.[6]

The facts in *In re Brendern Enterprises, supra,* are essentially the same as these in the present case. In *Brendern Enterprises,* the debtor sought the turnover of equipment which had been shipped to the defendant for warranty repairs. The defendant sold audio equipment to the debtor for retail sale. Pursuant to an agreement, the debtor would ship the defendant equipment returned by its retail customers for repair, replacement or cash refund.

---

and, therefore, cannot constitute a prepetition debt subject to setoff under 11 U.S.C. § 553(a).

Another $5,705.00 was received by Salapongse within 90 days before the filing of the petition and it is questionable whether this amount could be setoff. 11 U.S.C. § 553(a)(3) prohibits the setoff of debts owed to the debtor which were incurred by a creditor (1) within 90 days before the filing of the petition, (2) while debtor was insolvent, and (3) for the purpose of obtaining a right of setoff against the debtor. By statute, debtor is presumed to be insolvent within 90 days immediately preceding the filing of the petition. 11 U.S.C. § 553(c). Additionally, Salyapongse in effect admitted that he kept the funds for the purpose of obtaining a right of setoff against claims he had against debtor.

Since this Court concludes that mutuality is lacking as to all the funds held by Salyapongse (see discussion, *infra*) setoff of this $8,405.00 would not be allowed in any case.

6. Salyapongse's argument as to debtor's right to the funds actually weakens his setoff argument. Salyapongse claims that the funds he holds are a debt he owes to debtor. If, as he also claims, debtor's right to the funds is not absolute, then the funds would not be a debt owed to debtor which would be subject to setoff. In any event, this argument is without merit because of the Court's finding that the funds are the property of debtor's estate.

Prior to the filing of the bankruptcy petition the debtor shipped a quantity of returned equipment to the defendant for warranty repairs. The defendant admitted that it had neither repaired, replaced, nor returned the equipment to the debtor, but rather attempted to assert a right to retain the equipment as a setoff against a debt owed by the debtor to the defendant. The bankruptcy court held that the returned equipment was held by the defendant in the capacity of a bailee without color of lien. Therefore, the equipment was not subject to setoff because it was not owed to the bankruptcy estate but rather was owned by it. 12 B.R. at 460. The court concluded that since no mutuality of debt existed between the parties, the debtor was entitled to turnover "undiminished by any set-off." *Id.*

In the present case, it has already been established that the accounts receivable proceeds held by Salyapongse without debtor's authorization are property of debtor's estate. Therefore, Salyapongse does not "owe" debtor a debt against which he could setoff his claims against the estate. Although it is well settled that a setoff will not be allowed where it is premised on an unlawful act of conversion (see, *e.g., In re Windsor Communications Group, Inc., supra*), the *Brendern Enterprises* decision shows that it is not necessary to find that Salyapongse actually converted the funds in order to find that there is no mutuality of debt. Merely finding that Salyapongse does not "owe" debtor a debt is sufficient to show a lack of mutuality. Accordingly, the $74,493.17 now being held by Salyapongse is property of debtor's estate which is being held by Salyapongse without authorization and which should be turned over to the estate.

■ In its Second Amended Complaint, debtor asked for the first time for prejudgment interest apparently because of Salyapongse's alleged conversion of debtor's funds. The Court has already determined that it does not have to decide whether there has been a conversion in order to find that the parties lack mutuality of debt for purposes of setoff. However, even assuming that the evidence presented in this case supported the conversion allegation, debtor would still not be entitled to prejudgment interest.

In Illinois, the right to prejudgment interest is governed by statute. *Charles Selon & Associates, Inc. v. Estate of Aisenberg,* 103 Ill.App.3d 797, 431 N.E.2d 1214, 1217, 59 Ill.Dec. 457, 460 (1981); *Jensen v. Chicago & Western Indiana Railroad Co.,* 94 Ill.App.3d 915, 419 N.E.2d 578, 597, 50 Ill.Dec. 470, 489 (1981). Section 2 of the Illinois Interest Act provides, *inter alia,* that interest shall be allowed "on money withheld by an unreasonable and vexatious delay of payment." Ill.Rev.Stat., ch. 17, ¶ 6402. This provision has been held to authorize the awarding of prejudgment interest in conversion actions where there has been an unreasonable and vexatious delay of payment. *Charles Selon, supra; Jenson, supra.*

In the present case, there was no unreasonable and vexatious delay of payment. Rather, the evidence showed that Salyapongse honestly believed, albeit erroneously, that he was entitled to setoff the accounts receivable proceeds he held against the amounts he was owed by debtor. The delay in payment can be attributed in part to debtor's failure to file this turnover action until November, 1987, almost two years after Salyapongse first began withholding the funds. Thereafter the delay was caused by the litigation itself. Furthermore, debtor did not even make a demand for payment until June, 1988. Under these circumstances, Salyapongse's failure to turnover the funds to debtor was not "unreasonable or vexatious" so as to warrant the awarding of prejudgment interest in this case. *See, City of Chicago v. Chicago City Bank & Trust,* 129 Ill.App.3d 410, 472 N.E.2d 827, 832–33, 84 Ill.Dec. 690, 695–96 (1984); *Charles Selon, supra.* 431 N.E.2d at 1218, 59 Ill.Dec. at 461.

IT IS THEREFORE ORDERED that the motion to dismiss for lack of subject matter jurisdiction and the motion for summary judgment filed by Dr. Amorn Salyapongse are DENIED.

IT IS FURTHER ORDERED that Dr. Amorn Salyapongse shall TURN OVER to debtor-in-possession, L.P. Maun, M.D., Ltd., the sum of $74,493.17, which constitutes the proceeds of debtor's accounts receivable currently held by Dr. Salyapongse.